**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

SI03, INC.,  )
  )
  *Plaintiff*,  )
  )   Case No:  1:25-cv-00103-ACL
v.  )
  )   Jury Trial Demanded
THE MBP COMPANY, LLC  )
  d/b/a MARRON FOODS,  )
  )
  *Defendant*.  )

## DEFENDANT'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant and Counterclaimant The MBP Company, LLC d/b/a Marron Foods

("Marron Foods") hereby answers Plaintiff and Counterclaim Defendant SI03, Inc.'s

("SI03") First Amended Complaint. All allegations contained in SI03's First Amended

Complaint not expressly or specifically admitted herein are denied.

## PARTIES

1.     SI03 is a Delaware corporation with its principal place of business at 3849

Business Park Place, Cape Girardeau, MO 63701.

**ANSWER:** Marron Foods admits that SI03 is a Delaware corporation. Marron
Foods lacks sufficient knowledge or information to form a belief about the truth of
the allegations in Paragraph 1 regarding SI03's "principal place of business" and
therefore denies the allegations.

2.     Marron is a Wisconsin limited liability company.

**ANSWER:** Marron Foods admits that The MBP Company, LLC d/b/a Marron
Foods is a limited liability company organized in Wisconsin.

3.     Upon information and belief, the sole member of Marron is Matthew

Pearson, an individual who resides in the State of New York.

1

**ANSWER:** Marron Foods admits that Matthew Pearson resides in New York and is the sole LLC member of The MBP Company, LLC d/b/a Marron Foods.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 insofar as the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

**ANSWER:** Marron Foods admits that the parties to this lawsuit have complete diversity of citizenship and—based only on the facial allegations of SI03's First Amended Complaint and for the purpose of this Court's jurisdiction only—the amount in controversy potentially exceeds $75,000.

5.      This Court has personal jurisdiction over Marron pursuant to a binding forum selection clause agreed to by Marron as part of the parties' contract that is at issue in this matter.

**ANSWER:** To the extent Paragraph 5 refers to documentation sent on February 11, 2025 to Marron Foods, Marron Foods admits only that the documentation purports to contain, among other things, "Terms and Conditions" including a forum selection clause designating the Eastern District of Missouri as a forum. The remaining allegations in Paragraph 5 state legal conclusions about whether an agreement was formed or whether its terms are binding on the parties to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

6.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(1) & (c)(2).

**ANSWER:** Based only on the facial allegations of SI03's First Amended Complaint as to SI03's principal place of business, Marron Foods admits that venue is proper in this jurisdiction.

## FACTS

7.      SI03 issued its Purchase Order No. 1062 ("PO 1062") to Marron on February 11, 2025, for the agglomeration of 35,000 pounds of whey protein concentrate

with soy lecithin.

> **ANSWER:** Marron Foods admits that it received a document described as Purchase Order No. 1062 ("PO 1062") from SI03 on February 11, 2025 for the agglomeration of 35,000 pounds of whey protein concentrate with soy lecithin. To the extent the allegations contained in Paragraph 7 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. Marron Foods denies all other allegations.

8.      SI03's PO 1062 included specifications relating to the agglomeration work to be performed by Marron, including specifications for mixability, moisture content, and amount of scorched particles of the finished agglomerated whey protein concentrate.

> **ANSWER:** To the extent the allegations contained in Paragraph 8 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. Marron Foods denies that PO 1062 itself contained specifications for mixability, moisture content, and amount of scorched particles of the finished agglomerated product. Marron Foods denies all other allegations.

9.      Pursuant to its terms, PO 1062 is governed by SI03's Purchasing Terms & Conditions ("SI03 T & C"), which SI03 delivered to Marron with PO 1062.

> **ANSWER:** To the extent the allegations contained in Paragraph 9 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 9 state a legal conclusion—that the Terms and Conditions "governed" PO 1062—to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

10.     Paragraph 1 of the SI03 T & C directs that PO 1062 "constitutes an offer to buy goods or services according to the description and other terms set forth on its face and reverse side. No additional or different terms offered by [Marron] shall be or become part of this order and any such terms are hereby rejected. This purchase order shall not be

modified without the express written approval of [SI03].”

> **ANSWER:** Marron Foods admits only that the document described as “Terms and Conditions” contains the quoted language. To the extent the allegations contained in Paragraph 10 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 10 state a legal conclusion to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

11.     Pursuant to Paragraph 3 of the SI03 T & C, Marron “warrant[ed] that all goods and services covered by [PO 1062] will be furnished in strict accordance with the provisions of [PO 1062], the specifications furnished by [SI03], and standards, laws, rules and regulations relating to such goods or services; and shall be free from defects in design, material and workmanship. The foregoing and all other express and implied warranties that may apply to the goods and services furnished hereunder shall be deemed conditions of this purchase order.”

> **ANSWER:** Marron Foods admits only that the document described as “Terms and Conditions” contains the quoted language. To the extent the allegations contained in Paragraph 11 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 11 state a legal conclusion about the requirements of an alleged contractual agreement to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

12.     Pursuant to Paragraph 4 of the SI03 T & C, “[u]pon delivery, [SI03] may inspect any goods received pursuant to [PO 1062]. Goods or services which are nonconforming shall, at [SI03’s] option, be replaced at [Marron’s] sole expense, and any replacement goods shall be subject to all terms and conditions set forth herein.”

> **ANSWER:** Marron Foods admits only that the document described as “Terms and Conditions” contains the quoted language. To the extent the allegations contained

in Paragraph 12 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 12 state a legal conclusion about the requirements of an alleged contractual agreement to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

13.     Pursuant to Paragraph 16 of the SI03 T & C, Marron "warrant[ed] that the goods and/or services furnished hereunder shall be in compliance with all applicable federal, state and local laws and regulations supplementary thereto and [Marron] will indemnify and hold harmless [SI03] against any costs, liability or losses arising out of [Marron's] non-compliance."

**ANSWER:** Marron Foods admits only that the document described as "Terms and Conditions" contains the quoted language. To the extent the allegations contained in Paragraph 13 purports to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 13 state a legal conclusion about the requirements of an alleged contractual agreement to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

14.     Paragraph 16 of the SI03 T & C further directs that "[t]his Agreement shall be governed and construed in accordance with the laws of the State of Missouri without regard to its conflict of law provisions.  The parties agree that all actions and proceedings in conjunction herewith shall be brought only in the state or federal courts within the Eastern District of Missouri."

**ANSWER:** Marron Foods admits only that the document described as "Terms and Conditions" contains the quoted language. To the extent the allegations contained in Paragraph 14 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 14 state a legal conclusion about the requirements of an alleged contractual agreement to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

15.    Marron accepted PO 1062, thereby forming a contract between the parties, the terms of which are stated in PO 1062, which includes the SI03 T & C.

> **ANSWER:** Marron Foods admits that it agreed to provide agglomeration services for SI03, and that SI03 agreed to pay for those services. Marron Foods further admits that certain of the terms agreed to between the parties are reflected in PO 1062. To the extent the allegations contained in Paragraph 15 purport to rely on or restate any document, Marron Foods states that the document speaks for itself and is the best evidence of its content, and Marron Foods denies all allegations in contradiction therewith. The remaining allegations in Paragraph 15 state a legal conclusion about the formation of an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

16.    Pursuant to the parties' contract, SI03 shipped to Marron 35,000 pounds of whey protein concentrate.

> **ANSWER:** Marron Foods admits only that it received approximately 35,000 pounds of whey protein concentrate from SI03. The remaining allegations in Paragraph 16 state a legal conclusion about the requirements of an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

17.    Marron agglomerated the whey protein concentrate with soy lecithin and shipped the agglomerated whey protein concentrate to SI03.

> **ANSWER:** Marron Foods admits only that it agglomerated the whey protein concentrate it received from SI03 with soy lecithin. Marron Food denies the remainder of the allegations in Paragraph 17, including that Marron Foods "shipped" the material to SI03.

18.    SI03 inspected the agglomerated whey protein concentrate by performing, *inter alia*, nutritional and moisture testing; organoleptic testing; physical inspection; and mixability testing.

> **ANSWER:** Marron Foods admits only that it received email communications from SI03 alleging that SI03 had performed certain testing on the agglomerated product. Beyond that, Marron Foods lacks sufficient knowledge or information to

form a belief about the truth of the allegations in Paragraph 18 and therefore denies the remaining allegations.

19.    SI03's inspection showed that the agglomerated whey protein concentrate received from Marron exhibited, *inter alia*, lack of mixability; out-of-specification moisture content; and an excessive amount of scorched particles.

**ANSWER:** Marron Foods admits only that it received email communications from SI03 alleging issues relating to mixability, moisture content, and scorched particles. Beyond that, Marron Foods lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 19, including what SI03's inspection "showed," and therefore denies the remaining allegations.

20.    SI03 sent samples of the agglomerated whey protein to two independent analytical testing laboratories for moisture content testing.

**ANSWER:** Marron Foods admits only that it received email communications from SI03 alleging that it had performed laboratory testing. Beyond that, Marron Foods lacks sufficient knowledge or information to form a belief about the truth of the allegations in Paragraph 20 and therefore denies the remaining allegations.

21.    Both analytical testing laboratories confirmed that samples of the agglomerated whey protein concentrate exhibited moisture content that exceeded SI03's moisture-content specification.

**ANSWER:** Deny.

22.    The agglomerated whey protein concentrate delivered by Marron to SI03 cannot be used by SI03.

**ANSWER:** Deny.

23.    SI03 sent an email to Marron's representative on May 7, 2025, summarizing the problems that SI03 had identified in the agglomerated whey protein concentrate that Marron had delivered pursuant to PO 1062 and attaching relevant

7

documentation.

> **ANSWER:** Marron Foods admits only that it received an email from SI03 on May 7, 2025 alleging it had identified certain issues with the product. Marron Foods denies the remaining allegations contained in Paragraph 23.

24. SI03 requested, in the May 7, 2025, email that Marron accept return of the agglomerated whey protein concentrate and, pursuant to Paragraph 4 of the SI03 T & C, replace it with 35,000 pounds of agglomerated whey protein concentrate that complied with the parties' contract, including SI03's specifications.

> **ANSWER:** Marron Foods admits only that SI03 requested that Marron Foods accept the return of the product and provide a full replacement of agglomerated whey protein concentrate in the May 7, 2025 email. The remaining allegations in Paragraph 24 state legal conclusions regarding alleged contractual requirements to which no response is required. To the extent a response is required, Marron Foods denies the remaining allegations.

25. Marron has refused SI03's request.

> **ANSWER:** Admit.

26. SI03 has been damaged by Marron's wrongful conduct at least insofar as SI03 has been forced to replace the 35,000 pounds of whey protein concentrate ruined by Marron and has been forced to have replacement whey protein concentrate agglomerated by another vendor.

> **ANSWER:** Deny.

27. Additionally, SI03 has been forced into a back-order condition with respect to the final products that SI03 intended to manufacture using the agglomerated whey protein concentrate that Marron was required to deliver, which has caused SI03 to lose sales and negatively affected SI03's reputation.

> **ANSWER:** Marron Foods denies paragraph 27 to the extent it states or implies

8

that any action or inaction by Marron Foods forced SI03 into a "back-order condition," "caused SI03 to lose sales," or "negatively affected SI03's reputation." Marron Foods lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations in Paragraph 27 and therefore denies the allegations.

## COUNT I

## BREACH OF CONTRACT

28.     SI03 incorporates herein by reference the allegations set forth in paragraphs 1-27.

**ANSWER:** Marron Foods incorporates by reference its responses to Paragraphs 1-27 as if fully set forth herein.

29.     SI03 and Marron entered into a contract, the terms of which are set forth in SI03's PO 1062, which includes SI03's T & C and SI03's specifications.

**ANSWER:** The allegations in Paragraph 29 state a legal conclusion about the formation and terms of an alleged contract to which no response is required. To the extent a response is required, Marron denies the allegations and denies that the document described as "terms and conditions" constitutes any part of the agreement between the parties.

30.     SI03 performed all obligations required of it pursuant to the parties' contract.

**ANSWER:** The allegations in Paragraph 30 state a legal conclusion about SI03's obligations under an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

31.     Marron breached the parties' contract by failing to properly agglomerate with soy lecithin the 35,000 pounds of whey protein concentrate that SI03 supplied to Marron, thereby causing the finished product to exceed allowable moisture content levels; be unmixable; and contain an excessive, out-of-specification amount of scorched particles.

**ANSWER:** The allegations in Paragraph 31 state a legal conclusion about Marron Foods' obligations under an alleged contract to which no response is required. To

9

the extent a response is required, Marron Foods denies the allegations.

32.    SI03 has been damaged as a result of Marron's breaches of the parties' contract.

**ANSWER:** The allegations in Paragraph 32 state a legal conclusion about SI03's alleged damages under an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

## COUNT II

## BREACH OF WARRANTY

33.    SI03 incorporates herein by reference the allegations set forth in paragraphs 1-27.

**ANSWER:** Marron Foods incorporates by reference its responses to Paragraphs 1-32 as if fully set forth herein.

34.    Marron provided services to SI03 pursuant to warranties set forth in the parties' contract.

**ANSWER:** Marron Foods admits only that it provided agglomeration services to SI03. The remaining allegations in Paragraph 34 state a legal conclusion about the terms of an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

35.    SI03 would not have entered into the parties' contract but for the warranties provided by Marron as part of the parties' contract.

**ANSWER:** Marron Foods lacks sufficient knowledge or information to form a belief about the hypothetical statement in Paragraph 35 and therefore denies the allegations. The remaining allegations in Paragraph 35 state a legal conclusion about alleged warranties and the requirements of an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

36.    Marron's wrongful conduct as set forth herein and in other ways not yet determined constitutes a breach of the warranties set forth in the parties' contract.

**ANSWER:** The allegations in Paragraph 36 state a legal conclusion about alleged "wrongful conduct" and the terms of an alleged contract to which no response is required. To the extent a response is required, Marron Foods denies the allegations.

37.     SI03 notified Marron of its breaches of warranty in a timely fashion and requested Marron to take appropriate corrective action pursuant to the terms of the parties' contract, and Marron refused to do so.

**ANSWER:** Deny.

38.     Marron's breaches of the warranties in the parties' contract have damaged SI03 in an amount to be determined at trial.

**ANSWER:** The allegations in Paragraph 38 state a legal conclusion about the terms of an alleged contract, alleged warranties, and SI03's alleged damages to which no response is required. To the extent a response is required, Marron Foods denies the allegations and denies that SI03 has been damaged as the result of any action or inaction by Marron Foods.

**WHEREFORE**, having fully answered SI03's Complaint, Marron Foods respectfully requests that the Court dismiss SI03's claims and award Marron Foods all other relief that the Court deems just and proper.

## ADDITIONAL DEFENSES & AFFIRMATIVE DEFENSES

Without admitting any of the allegations in the First Amended Complaint, Marron Foods asserts and alleges the following defenses and affirmative defenses. By alleging the defenses and affirmative defenses below, Marron Foods does not in any way agree or concede that SI03 has properly stated any cause of action or that Marron Foods has the burden of proof or persuasion with respect to any of its defenses. Marron Foods has not knowingly or intentionally waived any defenses and reserves the right to assert any and all additional defenses that become available or apparent during discovery, and Marron Foods

reserves the right to seek to amend its answer.

1.     SI03's First Amended Complaint fails to state a claim upon which relief may be granted.

2.     SI03's claims are barred by the doctrines of waiver and estoppel. By agreeing to modify the specifications of the product and/or by accepting delivery of the product after having tested pre-shipment samples of the product and with knowledge of its specifications and any alleged defects, SI03 waived its right to assert the claims in the First Amended Complaint and/or is estopped from pursuing the claims it has asserted.

3.     SI03's claims are barred because it has unclean hands in bringing its claims. SI03 enters this lawsuit with unclean hands because it caused raw whey protein material to be delivered to Marron Foods that both had elevated moisture levels and moisture levels above even those identified in its Certificate of Analysis. SI03 further has refused to pay Marron Foods for any agglomeration services provided to SI03, including services for which SI03 has raised no concerns and does not contest Marron Foods' performance of the agglomeration services.

4.     SI03's claims are barred by the doctrines of contract modification and/or novation. SI03 and Marron Foods reached a new agreement modifying and/or novating the original terms.

5.     SI03's claims are barred because SI03 has ratified, acquiesced to, and/or consented to the services rendered and agglomerated product produced by Marron Foods. Among other things, SI03 agreed to change to the acceptable moisture levels of the agglomerated product when (1) SI03 agreed to allow a moisture content up to 6% in the

agglomerated product due to the high moisture content of the raw materials SI03 provided to Marron Foods and (2) SI03 accepted delivery of the agglomerated product from Marron Foods—after SI03 had tested pre-shipment samples of the agglomerated product—by causing its truck containing the agglomerated product to leave the premises at Marron Foods' plant.

6.      SI03's claims are barred by its own breaches of contract and/or the doctrines of first to breach and/or anticipatory breach. SI03 was the first party to breach the contract when it provided raw materials that could not meet SI03's own specifications for the final product and were wrongly identified with incorrect moisture levels identified in the Certificates of Analysis provided by SI03. That constituted a material breach of the agreement between Marron Foods and SI03.

7.      SI03's claims are barred by its own failure to perform the contract.

8.      SI03's claims are barred by improper notice of breach.

9.      SI03's claims are barred by a failure to fulfill all conditions precedent. A condition precedent to Marron Foods' performance of agglomeration services within the specifications requested by SI03 was that SI03 would provide raw material capable of being agglomerated within those specifications. When SI03 failed to provide raw materials within those specifications and the Certificates of Analysis misrepresented the specifications of the raw material to Marron Foods, the condition precedent failed.

10.     SI03's claims are barred because it was impossible and/or commercially impracticable for Marron Foods to fully perform. SI03 provided raw materials with specifications rendering it impossible or commercially impracticable for Marron Foods to

13

produce an agglomerated product within the original specifications requested by SI03.

11.     SI03's claims are barred by the doctrines of unilateral or mutual mistake of fact. The fact that the moisture content of the raw materials provided by SI03 to Marron Foods did not match the representations of the Certificates of Analysis accompanying the raw materials constituted a unilateral or mutual mistake of fact that was material to the agreement for agglomeration services between the parties.

12.     SI03's claims are barred by the doctrine of promissory estoppel. In reliance on SI03's promises, Marron Foods provided the full agglomeration services solicited by SI03, but SI03 did not pay Marron Foods for any of those services. It would be unjust to allow SI03 to not fulfill its promise to pay Marron Foods for those services. Therefore, SI03 is estopped from recovering against Marron Foods.

13.     SI03's claims are barred because SIO03 would be unjustly enriched if allowed to recover the sums alleged in the Amended Complaint. Marron Foods provided the full agglomeration services solicited by SI03, including by enriching SI03 by providing it with an agglomerated product, but SI03 has not paid Marron Foods for any of those services. It would be unjust to allow SI03 to retain the benefit it received from Marron Foods' services, and therefore SI03 cannot recover against Marron Foods.

14.     SI03's claims are barred by the doctrine of unconscionability.

15.     SI03 has failed to state any claim for damages. The damages sought by SI03 (of replacement of the underlying material) would result in a windfall to SI03 given that the value of the final product delivered to SI03 was equal to or greater than the raw material as it existed before processing.

16.    SIO3's claims are barred because the type and measure of damages sought by SI03 are not recognized or permissible under Missouri law.

17.    SI03's claims are subject to set-off and/or recoupment.

18.    SI03's claims are barred because the damages sought by SI03 were not caused in fact by any action or inaction of Marron Foods.

19.    SI03's claims are barred because the damages sought by SI03 cannot be ascertained with reasonable certainty, as that phrase is used under Missouri law.

20.    SI03's claims are barred because Marron Foods' actions and inactions did not constitute the proximate cause of any damage suffered by SI03.

21.    SI03's claims are barred because SI03 does not have standing to assert the alleged claims because it did not suffer any recognizable and concrete damages.

22.    SI03 fails to allege facts or a cause of action sufficient to support a claim for costs or attorneys' fees, equitable relief, punitive damages, or any award of damages.

23.    SI03's damages, if any, were caused by the acts and failure of persons or entities other than Marron Foods. In particular, if and to the extent the specifications of the final agglomerated product did not meet the specifications required by SI03, that is a direct result of the raw materials supplied by SI03 and/or the incorrect specifications identified in the Certificates of Analysis.

24.    SI03's claims are barred because SI03 failed to mitigate its damages.

25.    Marron Foods reserves the right to later assert all applicable defenses.

## THE MBP COMPANY, LLC'S COUNTERCLAIMS AGAINST SI03, INC.

Counterclaimant The MBP Company, LLC d/b/a Marron Foods ("Marron Foods") hereby brings these counterclaims against Counterclaim Defendant SI03, Inc. ("SI03"), stating as follows:

### PARTIES

1.      Upon information and belief, SI03 is a Delaware corporation with its principal place of business at 3849 Business Park Place, Cape Girardeau, MO 63701.

2.      Marron Foods is a Wisconsin limited liability company. Marron Foods' sole LLC member is Matthew Pearson, who is a citizen of the State of New York.

### JURISDICTION AND VENUE

3.      Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action because complete diversity exists amongst the parties and the amount in controversy exceeds $75,000.00.

4.      This Court has personal jurisdiction over SI03 because its principal place of business lies within Missouri.

5.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(1) & (c)(2).

### FACTS

**Marron Foods' Business Providing Agglomeration Services**

6.      Marron Foods is a company operating in the food service industry with a processing plant located in Durand, Wisconsin (the "plant"), corporate office in New York, development lab in Georgia, and sales/customer service representative locations located on the East Coast and in the Midwest.

7. At Marron Foods' plant, Marron Foods provides its customers with, among other things, instantizing and agglomeration services yielding ingredients that are highly dispersible and soluble in liquids, including, for example, whey protein and dry milk powder. These materials can be and often are incorporated into final products including sports nutritional products and supplements like protein shakes and bars.

8. Marron Foods' customers include leading food product manufacturing companies that incorporate instantized food materials into their final food product and resellers of instantized food materials who in turn sell the material to food product manufacturing companies.

9. While Marron Foods provides the agglomeration service, the raw material that Maron Foods processes is generally supplied by Marron Foods' customers (or third-party companies supplying raw material on behalf of those customers). It is typically not supplied by Marron Foods.

10. The agglomeration process involves applying a solution often containing lecithin that coats the molecules of the raw powder material thereby making the material dispersible and soluble in liquids. The coated powder material is then dried using heaters. However, the heaters can only be applied to dry the material so much before potentially impacting its quality, including the dispersibility and causing the presence of scorched particles. Therefore, the ability to achieve certain moisture content levels in the final product is largely dependent on the moisture content in the raw material received from Marron Foods' customers. For example, a raw material with a moisture content of over 6% cannot generally be agglomerated into a final product with a moisture content

significantly below 6%.

11.    The raw materials are delivered by truck to Marron Foods' plant in sealed 50-pound bags. Transport by truck is typically arranged and paid for by Marron Foods' customers.

12.    The raw materials are ordinarily supplied to Marron Foods along with a Certificate of Analysis (or other documentation) identifying the material's specifications, including protein content and moisture, amongst other characteristics. The Certificate of Analysis is a formal laboratory document verifying a food product's quality and safety by confirming it meets specific specifications. Certificates of Analysis are considered reliable indicators of the raw material's characteristics and relied on by Marron Foods in processing the material. Notwithstanding, given the importance of the raw material's specifications in the ability (or lack thereof) to achieve the desired specifications for the final agglomerated product, as a standard procedure, Marron Foods takes and retains samples of the raw material received from customers in the event lab testing later becomes necessary.

**Marron Foods' Work for SI03**

13.    Upon information and belief, SI03 is a company owned and/or controlled by Derek Cornelius that operates as, among other things, a reseller of whey and milk protein.

14.    From time to time, SI03 has requested that Marron Foods provide agglomeration services with respect to raw materials provided by SI03 (or other companies supplying raw material on SI03's behalf).

15.    In or around February 2025, SI03 contacted Marron Foods about conducting agglomeration work for its whey and milk protein product at Marron Foods' plant.

16.    As a condition of agreeing to provide the requested agglomeration work, Marron Foods insisted that SI03 pay for at least 50% of a prior unpaid invoice for services that Marron Foods had previously rendered for SI03 and/or Derek Cornelius but for which Marron Foods had not been paid. SI03 and/or Derek Cornelius agreed to do so and paid 50% of the prior unpaid amount.

17.    Thereafter, Marron Foods agreed to provide agglomeration work with respect to two orders from SI03.

**Marron Foods Completes Order No. 1064 Without Complaint**

18.    As to one of the orders ("Order No. 1064"), Marron Foods agreed to perform services related to the agglomeration of milk protein (milk protein concentrate 70) without lecithin.

19.    SI03 agreed to pay approximately $27,090.50 for those services.

20.    Marron Foods performed the requested agglomeration services with respect to Order No. 1064.

21.    On or around April 25, 2025, Marron Foods delivered the agglomerated product to SI03 by loading the material onto SI03's truck (or a truck arranged by SI03 on its behalf) at Marron Foods' plant.

22.    SI03 accepted delivery of the shipment by causing the removal of the truck containing the product from the premises.

23. Marron Foods issued an invoice on or around April 25, 2025 demanding payment from SI03 in the amount of $27,090.50.

24. To date, SI03 has not complained or raised any concerns about the finished agglomerated product.[1]

25. SI03 has never paid Marron Foods the outstanding invoice of $27,090.50.

**Marron Foods Completes Order No. 1062**

26. As to the other order ("Order No. 1062"), Marron Foods agreed to perform services related to the agglomeration of whey protein ("Saputo Cheese WPC 80 210 kg") with soy lecithin.

27. SI03 agreed to pay approximately $11,286.27 for those services.

28. As with most customers, Marron Foods received the raw material from SI03 at Marron Foods' plant accompanied with Certificates of Analysis indicating the characteristics of the raw material. The delivery included four separate "lots" of material.[2] The Certificates of Analysis indicated a moisture content of, on average across the lots, just above 5%.

29. In or around March 2025, during the agglomeration process, Marron Foods sent to SI03 pre-shipment quality control samples of product produced from the agglomeration process. Thereafter, on or around March 19, 2025, SI03 communicated to Marron Foods that, based on tests SI03 had run on those samples, the samples did not meet SI03's specifications regarding mixability.

30. In response, Marron Foods explained that the moisture content of the raw

---

[1] SI03's Amended Complaint does not address this order.

[2] Separate Certificates of Analysis accompanied each lot.

material received was already high thus causing difficulties in reaching SI03's request for 5% moisture in the final agglomerated product.[3] Further, the heat applied in trying to achieve 5% moisture could have an adverse effect on the qualities of the final product including its dispersibility. In other words, 5% in moisture, as requested by SI03, was not achievable with the raw material provided by SI03 without potentially impacting the quality of the agglomerated product.

31.     For these reasons, Marron Foods requested, and SI03 agreed, to modify SI03's requested moisture specification upwards from 5% to 6%. Marron Foods confirmed this agreement by email on April 2, 2025. In reliance on this agreement, Marron Foods completed the agglomeration work in compliance with SI03's specifications, achieving a moisture content of no greater than 6%.

32.     On or around April 10, 2025, Marron Foods delivered the agglomerated product to SI03 by loading the material onto SI03's truck (or a truck arranged by SI03 on its behalf) at Marron Foods' plant.

33.     Prior to delivery, Marron Foods had provided SI03 with pre-shipment samples (described above), which SI03 and/or Derek Cornelius had reviewed, voiced concerns regarding to Marron Foods, and agreed to resolve by revising the moisture content upwards.

34.     After reviewing the pre-shipment samples, SI03 accepted delivery of the shipment by causing the removal of the truck containing the product from Maron Foods' premises.

---

[3] Typically, Marron Foods' customers supply a raw material with a moisture content at or slightly below the moisture content desired in the final agglomerated product.

35.     Marron Foods issued an invoice on or around April 10, 2025 demanding payment from SI03 in the amount of $11,286.27.

36.     SI03 has never paid Marron Foods the outstanding invoice of $11,286.27.

**SI03 Belatedly Raises Complaint Regarding Order No. 1062**

37.     In or around May 2025, SI03 complained about alleged quality problems with Order No. 1062—principally related to moisture levels.

38.     As part of its complaint, SI03 demanded that Marron Foods replace the entire agglomerated product from Order No. 1062.

39.     In response to SI03's complaint, Marron Foods conducted an internal investigation, including by testing the samples taken by Marron Foods of the raw materials supplied by SI03 for Order No. 1062 prior to processing.

40.     Marron Foods' internal investigation determined that the elevated moisture levels were in fact caused by SI03. In particular, while Marron Foods was aware that the raw materials provided by SI03 exhibited elevated moisture levels, the moisture levels of the raw material was even higher than believed—on average, nearly an entire percentage point above the moisture levels identified in the Certificates of Analysis.

41.     In any event, elevated moisture levels do not ruin an agglomerated product like the one delivered to SI03. At worst, the product retains its original value even if it cannot be instantized, and the product can still be sold at a market price. However, once SI03 accepted delivery of the product by causing the product to be removed from Marron Foods' plant, the product had no value to Marron Foods given that Marron Foods could no longer verify the chain of custody or that the product had been handled in a compliant

22

manner.

42.     In or around May 2025, Marron Foods explained to SI03 that any product specification issues were due to the condition of the raw materials provided by SI03, not the agglomeration services performed by Marron Foods.

43.     Marron Foods shared its internal investigation results with SI03 demonstrating the moisture levels of the raw materials received compared to the alleged moisture levels of the final product, confirming that any problems with the agglomerated product originated from the raw materials provided by SI03.

44.     Despite the results of Marron Foods' investigation, and without conceding its position on the facts, Marron Foods offered to waive its agglomeration fee charged to SI03 if SI03 dropped its request for new raw materials. Given SI03's stance, and difficulties encountered previously with this same customer, Marron Foods sought to sever its business relationship with SI03 altogether, even if that meant losing the $11,286.27 service fee.

45.     SI03 rejected this offer and has refused to pay the invoice.

46.     As of the filing date of this counterclaim, SI03 still has not paid a single dollar toward the two invoices described above.

<u>**COUNT I**</u>

**BREACH OF CONTRACT**

47.     Marron Foods incorporates herein by reference the allegations set forth in paragraphs 1-46.

48.     Marron Foods and SI03 entered into a contract for services when Marron

Foods agreed to provide agglomeration services to SI03, and SI03 agreed to pay for those services.

49.     Marron Foods performed its agglomeration services as requested by SI03, in accordance with the parties' agreement.

50.     Marron Foods properly agglomerated the raw materials provided by SI03 and complied with all material terms of the agreement, including as to moisture content.

51.     Marron Foods issued an invoice to SI03 for Order No. 1062 on April 10, 2025 in the amount of $11,286.27.

52.     Marron Foods issued an invoice to SI03 for Order No. 1064 on April 25, 2025 in the amount of $27,090.50.

53.     SI03 has never complained about the quality of the agglomerated product for Order No. 1064.

54.     SI03 still has not paid Marron Foods' invoices. Upon information and belief, SI03 refuses to pay the invoices in their entirety.

55.     Marron Foods has addressed SI03's complaints about the agglomerated product for Order No. 1062 and demonstrated that Marron Foods did not cause any alleged problems with the product.

56.     Any issues related to product specifications for Order No. 1062 were caused by the quality of the raw materials provided by SI03 and the incorrect representations about the quality of those raw materials in the certificates of analysis received by Marron Foods.

57.     SI03 breached its contractual agreement to pay for Marron Foods'

agglomeration services when it failed to pay the invoices.

58.     Marron Foods has been damaged because of SI03's breaches of its agreements to pay Marron Foods for its agglomeration services.

## COUNT II

## ACTION ON ACCOUNT

59.     Marron Foods incorporates herein by reference the allegations set forth in paragraphs 1-58.

60.     SI03 requested that Marron Foods furnish services for its business as reflected in Order Nos. 1062 and 1064.

61.     Marron Foods accepted SI03's request for services by furnishing its agglomeration services for the raw materials shipped to Marron Foods by SI03.

62.     Marron Foods charged SI03 a reasonable amount for agglomeration services in line with its standard fees charged to other customers as well as industry standards.

63.     SI03 has not paid any of the service fees submitted to it via invoices by Marron Foods. SI03 still owes Marron Foods a total of $38,376.77 for its services.

64.     SI03's refusal to pay the outstanding balance of $38,376.77 has damaged Marron Foods.

## COUNT III

## QUANTUM MERUIT

65.     Marron Foods incorporates herein by reference the allegations set forth in paragraphs 1-64.

66.     SI03 requested that Marron Foods provide agglomeration services for its raw materials by submitting Order Nos. 1062 and 1064 to Marron Foods.

67.     Marron Foods provided services to SI03 in the form of agglomeration processing at Marron Foods' plant.

68.     The agglomeration services Marron Foods provided to SI03 increased the value of SI03's raw materials by making them into an agglomerated product.

69.     SI03 has failed and/or refused to pay Marron Foods for its agglomeration services despite Marron Foods' demands in two invoices (issued April 10, 2025 and April 25, 2025) and a statement of outstanding amounts owed (issued October 9, 2025).

70.     Upon information and belief, SI03 has retained the benefit of Marron Foods' agglomeration services by either retaining the agglomerated product or selling it to a third party.

## COUNT IV

### UNJUST ENRICHMENT

71.     Marron Foods incorporates herein by reference the allegations set forth in paragraphs 1-70.

72.     SI03 received a benefit conferred by Marron Foods when Marron Foods provided agglomeration services requested by SI03 in Order Nos. 1062 and 1064.

73.     SI03 was enriched by that benefit because of the increased value of its raw materials as an agglomerated product.

74.     Because SI03 never paid Marron Foods for its agglomeration services, it

26

was enriched at Marron Foods' expense.

75.     Allowing SI03 to retain the benefit of the agglomerated product provided by Marron Foods without paying Marron Foods for its agglomeration services would be unjust.

## COUNT V

## PROMISSORY ESTOPPEL

76.     Marron Foods incorporates herein by reference the allegations set forth in paragraphs 1-75.

77.     By soliciting Marron Foods' agglomeration services via Order Nos. 1062 and 1064, SI03 promised to pay Marron Foods for those services.

78.     SI03 further promised to pay for Marron Foods to perform agglomeration services, if the agglomerated product did not exceed 6% in moisture content.

79.     Marron Foods incurred the cost of performing agglomeration services for SI03 because it expected SI03 to fulfill its promise to pay for the agglomeration services.

80.     SI03 expected and understood that Marron Foods intended to be compensated for agglomeration services when it agreed to perform them.

81.     An injustice would occur if SI03 were allowed to not fulfill its promise to compensate Marron Foods for its agglomeration services.

## PRAYER FOR RELIEF

**WHEREFORE**, Marron Foods prays for judgment against SI03 as follows:

a.     That the Court find SI03 has breached its contractual agreement to pay Marron

Foods for its agglomeration services.

b.      That the Court find that SI03 has been unjustly enriched by its conduct as described herein.

c.      That the Court award Marron Foods its damages caused by SI03 including (i) $38,376.77 owed to Marron Foods pursuant to the two invoices for Order Nos. 1062 and 1064, (ii) pre-judgment and post-judgment interest, (iii) Marron Foods' costs in litigating this action, and any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Defendant hereby demands a trial by jury on all issues properly triable by jury.

Dated: October 31, 2025                    Respectfully submitted,

**HUSCH BLACKWELL LLP**

By:          */s/ Aaron Chickos*
             Aaron Chickos (62072 MO)
             Zachary A. Hollstrom (75607 MO)
             8001 Forsyth Blvd., Suite 1500
             St. Louis, MO  63105
             Phone:     314-480-1500
             Facsimile: 314-480-1505
             aaron.chickos@huschblackwell.com
             zach.hollstrom@huschblackwell.com

*Attorneys for The MBP Company, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 31st day of October, 2025, a copy of the foregoing document was filed with the Clerk of the Court and served upon counsel of record via the Court's ECF system.

*/s/  Aaron Chickos*
Aaron Chickos
